

# NUMBER 13-23-00500-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

SOUTH TEXAS INDEPENDENT
SCHOOL DISTRICT,                                                    Appellant,

v.

RYAN BUSSE, JOSH KLOSTERMANN,
RUSSEL KLOSTERMANN,
LAYNE KLOSTERMANN,
MITCH THOMAS, OLIVIA RINCONES,
ROBERT RINCONES, RUBEN RINCONES,
ENRICA RINCONES, ANGELITA GARCIA,
ADELAIDA GARCIA, ANICETO GARCIA,
BETTY GARCIA, RAILEY RINCONES,
GARY BUSSE, ALISON SAVAGE, AND
LYFORD CONSOLIDATED INDEPENDENT
SCHOOL DISTRICT,                                                    Appellees.

On appeal from the 197th District Court
of Willacy County, Texas

# OPINION

**Before Chief Justice Contreras and Justices Benavides and Peña**
**Opinion by Justice Benavides**

Appellees Ryan Busse, Josh Klostermann, Russel Klostermann, Layne Klostermann, Mitch Thomas, Olivia Rincones, Robert Rincones, Ruben Rincones, Enrica Rincones, Angelita Garcia, Adelaida Garcia, Aniceto Garcia, Betty Garcia, Railey Rincones, Gary Busse, Alison Savage (collectively Taxpayers), and Lyford Consolidated Independent School District (Lyford CISD) filed suit against appellant South Texas Independent School District (South Texas ISD) seeking declarations that South Texas ISD's levy and expenditure of annual ad valorem taxes collected in Willacy County for the maintenance and operation of the district violates the contract with the voters doctrine and constitutes *ultra vires* conduct.[1] Appellees alleged that, because South Texas ISD now has a different purpose than it did when Willacy County voters elected to join the district in 1974, its continued taxation of Willacy County property owners without their approval is illegal. Appellees also sought emergency, temporary, and permanent injunctive relief.

South Texas ISD filed a plea to the jurisdiction challenging appellees' standing and otherwise asserting governmental immunity from suit. After conducting an evidentiary hearing, the trial court denied the plea. In this interlocutory appeal, South Texas ISD maintains that the trial court lacks subject-matter jurisdiction over appellees' claims because appellees lack standing, the case involves a nonjusticiable political question,

---

[1] Appellees also sued Willacy County and its county tax assessor-collector in her official capacity, neither of which are parties to this appeal.

and appellees have failed to allege a viable *ultra vires* claim. We reverse and render.

## I. BACKGROUND

South Texas ISD was originally formed as the Rio Grande Rehabilitation District for Handicapped Persons in 1963, when Cameron County voters authorized a local ad valorem tax to support the establishment and operation of the district. At that time, there were no federal or state laws mandating that every public school district provide free and appropriate public education for disabled children. Instead, the district was created pursuant to former Texas Education Code Chapter 26, which authorized rehabilitation districts for the limited purpose of providing educational and rehabilitation services to students with disabilities who were not being served in public schools.[2] *See* Act of Apr. 30, 1963, 58th Leg., R.S., ch. 106, § 2, 1963 Tex. Gen. Laws 186, 187. This included the authority to assess a property tax not to exceed "the rate of five cents (5¢) on each One Hundred Dollars ($100) of valuation." *See id.* § 9, 193.

In 1964, Hidalgo County voters elected to join the district. On September 24, 1974, by a publicly noticed "ORDER FOR SPECIAL ELECTION," the Commissioners Court of Willacy County called a special election

> to determine whether or not Willacy County, which is contiguous to the existing Rio Grande Rehabilitation District for Handicapped Persons, shall be annexed to and become part of said Rio Grande Rehabilitation District for Handicapped Persons, which said present [D]istrict has as its territory the combined areas of Hidalgo and Cameron Counties, in the State of Texas. The purpose of said Rehabilitation District is to acquire and construct

---

[2] In 1995, the Texas Legislature reenacted and revised Titles 1 and 2 of the Texas Education Code, including Chapter 26. Act of May 27, 1995, 74th R.S., ch. 260, § 1, 1995 Tex. Gen. Laws 2207. South Texas ISD is still governed by the former version of Chapter 26. *See* TEX. EDUC. CODE. ANN. § 11.301(a) ("A school district or county system operating under former Chapter 17, 18, 22, 25, 26, 27, or 28 on May 1, 1995, may continue to operate under the applicable chapter as that chapter existed on that date and under state law generally applicable to school districts that does not conflict with that chapter.").

residence centers and such other facilities, if any, as the Board of Directors may deem necessary or proper for the training and guidance of Handicapped Trainees and to maintain and operate said District and to have the power to annually levy ad valorem taxes on all taxable property within its boundaries at a rate not exceeding five cents (5¢) on each One Hundred Dollars ($100.00) of assessed valuation, as assessed for State and County purposes, all as authorized and provided for in House Bill 167 passed at the regular session of the 58th Legislature, 1963, which became effective on May 7th, 1963, as amended, and as brought forward in the Education Code Chapter 26 of Vernon's Texas Codes Annotated . . . .

Like their neighbors in Hidalgo County and Cameron County, Willacy County voters elected to join the district and to be subject to its limited taxing authority.

In 1975, the Texas Legislature amended Chapter 26 to permit rehabilitation districts to enroll students without disabilities and operate an "alternative school," defined as "a school setting for scholastics who cannot adequately be trained or educated in existing public school programs and who generally would not continue their education in the traditional academic school." *See* Act of June 19, 1975, 64th Leg., R.S., ch. 509, §§ 1–3, secs. 26.01, 26.11, 26.65, 1975 Tex. Gen. Laws 1351, 1351–52. That same year, the rehabilitation district changed its name to South Texas ISD. In 1983, the Texas Legislature again amended Chapter 26 to permit rehabilitation school districts to "provide facilities for, establish, and operate a vocational training school in the district." Act of May 20, 1983, 68th Leg., R.S., ch. 506, § 3, sec. 26.73(a)(1), 1983 Tex. Gen. Laws 2957, 2958–59. Pursuant to this grant of authority, appellees allege that South Texas ISD changed its purpose in 1983, transforming itself "from a rehabilitation district serving exclusively disabled students to a magnet school district." According to appellees, only 3.3% of students currently enrolled in South Texas ISD have disabilities requiring special education services, which is less than the statewide average of approximately 11%.

4

Since the 1983 amendments, South Texas ISD has continued to assess an annual maintenance and operation (M & O) tax on Willacy County property owners at a rate that does not exceed 5 cents per $100 of valuation. After South Texas ISD announced its tax rate for 2023, set at $0.0492 per $100 of valuation, appellees filed suit alleging that the tax was illegal because Willacy County voters never consented to being taxed for the purpose of maintaining and operating South Texas ISD as an independent school district. Appellees further allege that voters would need to approve South Texas ISD's change in purpose for the tax to be legal and that Willacy County has never held such an election. Finally, the Taxpayers claim that they have standing as taxpayers to seek declaratory and injunctive relief from this allegedly illegal conduct.

Lyford CISD is another independent school district serving parts of Willacy County.[3] Thus, the two districts overlap, and property owners within Lyford CISD pay ad valorem taxes to both districts. According to appellees' petition, "Lyford CISD is irreparably harmed by the imposition of an unlawful tax on its taxpayers." Specifically, Lyford CISD alleges that it "has outstanding debt obligation that must be paid by local ad valorem tax revenue[,] and it is limited in the taxes it can assess its taxpayers due to the undue tax burden imposed by the unlawful and unauthorized South Texas ISD tax rate." Lyford CISD complains that its inability to increase its tax rate "results in higher interest costs and a longer pay-back trajectory for its outstanding debt and an undue burden on Lyford CISD's operating budget." Lyford CISD sought the same declaratory and injunctive

---

[3] Willacy County is also served by Lasara Independent School District, Raymondville Independent School District, and San Perlita Independent School District.

5

relief as the Taxpayers.

Lyford CISD's superintendent, Dr. Michelle DeWitt, testified during the hearing on the plea to the jurisdiction, and South Texas ISD asked her to explain how South Texas ISD's annual property tax was harming Lyford CISD. Dr. DeWitt agreed that South Texas ISD's tax rate has no legal impact on Lyford CISD's own tax rate. According to Dr. DeWitt, Lyford CISD is already levying the maximum allowable M & O tax rate.[4] The problem, Dr. DeWitt explained, is that "if we wanted to use our Golden Pennies,[5] we would have to go up for an election." She agreed that whether to hold such an election is purely within Lyford CISD's discretion and that South Texas ISD has no control over that decision. Instead, Dr. DeWitt clarified that, although Willacy County voters approved Lyford CISD's $24 million bond proposal in 2022, asking taxpayers to approve additional taxes presents a "[p]olitical problem." Dr. DeWitt opined that, without South Texas ISD's M & O tax, voters would be more inclined to vote in favor of additional taxes for Lyford CISD, either by increasing its interest and sinking fund (I & S) tax rate, which is used for servicing construction debt,[6] or allowing it to access its Golden Pennies. Specifically, Dr. DeWitt testified that South Texas ISD receives $750,000 in local tax revenue from Lyford CISD's

---

[4] Lyford CISD's M & O tax rate tax for 2022 was $0.9603 per $100 of valuation.

[5] "Golden pennies" are "the first eight pennies of tax effort a district assesses above its [maximum compressed tax rate]." Tex. Educ. Agency, *Texas Public School Finance Overview* (June 2020), https://tea.texas.gov/finance-and-grants/state-funding/foundation-school-program/fsp-manuals/texas-public-school-finance-overview.pdf (last visited July 12, 2024). "These pennies are called golden because they are the pennies of tax effort for which a district can generate the highest level of enrichment funding." *Id.*

[6] Lyford CISD's I & S tax rate for 2022 was $0.28 per $100 of valuation. Therefore, the district's combined tax rate that year (M & O + I & S) was $1.2403 per $100 of valuation, making it approximately twenty-five times higher than South Texas ISD's 2022 tax rate, which, like 2023, was set at $0.0492 per $100 of valuation.

6

tax base that could otherwise go to Lyford CISD if approved by the voters. She also claimed that South Texas ISD receives more overall funding per student than Lyford CISD, which allegedly places Lyford CISD at a competitive disadvantage because it is expected to meet the same accountability measures with less resources.

Several of the Taxpayers testified at the hearing. For example, consistent with their petition, Alison Savage testified that she and her fellow Taxpayers object to "being double taxed" for a purpose that was never approved by Willacy County voters. She agreed, however, that her position as a taxpayer in Willacy County is "just like anybody else in the county."

South Texas ISD's superintendent, Dr. Marco Antonio Lara, also testified at the hearing. He explained that South Texas ISD is an open-enrollment district that operates "on a first-come, first serve-basis," with the only limitation being "the number of seats available in a school." He acknowledged that the 1983 amendment to Chapter 26 "authorize[d] us to not only serve the special needs students within the three-county area, but also to create . . . vocational schools . . . as a magnet district." The amendment, according to Dr. Lara, "also allowed us the ability to continue our taxation and to use up to three cents of that for facilities." At the time of the hearing, Dr. Lara estimated that 4.9% of the district's students receive special education. South Texas ISD also provides transportation for special needs students from other school districts who want to attend its half-day vocational training programs, and in those instances, the other school district gets credit for the student's attendance for funding purposes, not South Texas ISD. To his knowledge, South Texas ISD is the only school district "in the nation that provides free

7

and appropriate public education to students in other districts without compensation." He further testified that South Texas ISD annually collects over $30 million in combined local tax revenue from the property owners in Hidalgo, Cameron, and Willacy Counties.

A copy of South Texas ISD's annual financial report dated August 31, 2022, was admitted into evidence. The report reflects that, in 2022, the district received $34,323,977 in property tax revenue, $42,434,808 in state funds, and approximately $12.5 million from other sources. The report also states that South Texas ISD's Board of Trustees passed a balanced budget for 2023 that includes a 19% increase in expenditures.

On cross-examination, Dr. Lara conceded that he "misspoke" when he said that the 1983 amendment to Chapter 26 authorized South Texas ISD to "continue" to levy a property tax of up to five cents per $100 of valuation. Instead, he agreed that the legislation merely "authorized the district to be able to do that with voter approval." He agreed "that any tax has to be approved by the voters," and to his knowledge, the 1974 election was the only time voters in Willacy County authorized South Texas ISD to levy a tax.

The trial court denied South Texas ISD's plea to the jurisdiction, and this interlocutory appeal ensued. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8).

## II.    STANDARD OF REVIEW

Subject matter jurisdiction is essential to a court's authority to decide a case. *In re Abbott*, 601 S.W.3d 802, 807 (Tex. 2020) (orig. proceeding) (per curiam) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993)). Whether a trial court has subject matter jurisdiction over a plaintiff's claim is generally a question of law

8

we review de novo. *Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016).

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). It is the plaintiff's initial burden to plead facts that affirmatively demonstrate the trial court's subject matter jurisdiction, and we review this question as a matter of law. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). When a plea to the jurisdiction challenges the plaintiff's pleadings, we construe the pleadings liberally and look to the plaintiff's intent. *Id.* If the pleadings are deficient but do not demonstrate an incurable defect, then the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend their pleadings. *Id.* at 226–27. Conversely, if the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id.* at 226.

A governmental defendant may also challenge the existence of jurisdictional facts and support its argument with evidence. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). In such instances, the analysis "mirrors that of a traditional summary judgment." *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021) (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012)). When the governmental entity's evidence establishes the absence of a jurisdictional fact, the burden shifts to the plaintiff to raise a genuine issue of material fact for the jury to resolve; if the plaintiff fails in that regard, the trial court should rule on the jurisdictional question as a matter of law. *Miranda*, 133 S.W.3d at 228. "[I]n evaluating the parties' evidence, we take as true all evidence favorable to the nonmovant and indulge every

reasonable inference and resolve any doubts in the nonmovant's favor." *City of San Antonio v. Maspero*, 640 S.W.3d 523, 528–29 (Tex. 2022) (citing *Miranda*, 133 S.W.3d at 228).

### III.    STANDING

By its first issue, South Texas ISD argues that the Taxpayers and Lyford CISD lack standing to bring their claims for declaratory and injunctive relief.

### A.    Applicable Law

"Standing is a constitutional prerequisite to suit. A court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it." *Heckman v. Williamson County*, 369 S.W.3d 137, 151 (Tex. 2012). A plaintiff has standing to bring a claim if (1) the plaintiff suffered an injury in fact, (2) the injury was caused by the defendant's conduct, and (3) the relief requested is likely to redress the injury. *Id.* at 154–55 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Because this test parallels the federal test for Article III standing, Texas courts may look to federal precedent for guidance. *Id.* at 155.

As to the first element, parties generally do not have standing to sue unless they can show that they have "suffered a particularized injury distinct from that suffered by the general public." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555–56 (Tex. 2000). However, Texas has long recognized an exception for taxpayers, who may sue "to enjoin the illegal expenditure of public funds" without showing a particularized injury. *Id.* at 556. The same is true for the illegal collection of taxes. *See Morris v. Cummings*, 45 S.W. 383, 385 (Tex. 1898); *Davis v. Burnett*, 13 S.W. 613, 614 (Tex. 1890); *George v. Dean*, 47 Tex. 73, 84 (1877); *Blessing v. City of Galveston*, 42 Tex. 641, 654 (1875). Even if an

expenditure of public funds is used for a lawful purpose, the expenditure may nonetheless be "illegal" if the government had no authority to use the funds for that particular purpose. *Jones v. Turner*, 646 S.W.3d 319, 324 (Tex. 2022) ("Although the city services to which the disputed funds have been allocated are themselves lawful, the allegedly unlawful act was budgeting (and spending) any money that should have been allocated to the Fund on any service other than drainage and street maintenance because that act violates the City Charter."). Thus, "when the law requires that a certain amount of money be directed to a specific service, and the plaintiff alleges that it is being directed and spent elsewhere, the taxpayer has alleged an illegal expenditure sufficient to confer taxpayer standing." *Perez v. Turner*, 653 S.W.3d 191, 201 (Tex. 2022).

Even so, there are jurisprudential limitations on taxpayer standing. *Blue*, 34 S.W.3d at 556–58. Upon a proper showing, courts may consider the degree to which the taxpayer's suit may interfere with government activities. *Id.* at 558. If "[t]he potential for disruption of government operations is too great," then the court should decline to find taxpayer standing in that case. *Id.* Courts may also consider "the settled expectations of other taxpayers in the district" and how enjoining the allegedly illegal activity would affect those expectations. *Id.* Finally, because it is an exception to the general rule, taxpayer standing should be "strictly limited." *Id.* at 556; *Williams v. Lara*, 52 S.W.3d 171, 179 (Tex. 2001) (referring to taxpayer standing as a "limited exception" to the general rules concerning standing).

Sometimes the authority to levy taxes and expend public funds is granted by statute, and in other instances that authority comes directly from the voters by way of

11

popular election. *San Saba County v. McCraw*, 108 S.W.2d 200, 202 (Tex. 1937) ("It is settled that, where the Constitution authorizes the levy of a special tax by a vote of the taxpaying voters of a municipality or quasi municipality, such tax is not levied by the municipality or quasi municipality, but by the voters to whom has been delegated the taxing power."). When authorized through popular vote, the express terms of an order calling for a tax or bond election become an enforceable contract between the government and the voters, and any attempt to substantially impair the rights and expectations of the voters, as they existed at the time of the election, will be treated as a violation of article I, section 16 of the Texas Constitution. *Id.* at 203; *see, e.g.*, *Fletcher v. Howard*, 39 S.W.2d 32, 34–35 (Tex. 1931) (holding that bond proceeds could not be diverted from highway described in county order calling for bond election); *Robbins v. Limestone County*, 268 S.W. 915, 919 (Tex. 1925) (holding that taxes levied and collected for particular purpose could not be diverted to purposes other than for which they were voted); *Black v. Strength*, 246 S.W. 79, 80–81 (Tex. 1922) (holding that bond proceeds designated for specific road improvements in bond election could not be diverted to improve different roads because doing so would be contrary "to the will of those having to bear the bond burden"); *Moore v. Coffman*, 200 S.W. 374 (Tex. 1918) (holding that bond-financed bridge must be constructed at location designated in election order); *see also* TEX. CONST. art. I, § 16 (prohibiting "any law impairing the obligation of contracts").

Modern courts, including our own, continue to recognize the so-called "contract with the voters" doctrine. *See Ex parte City of Corpus Christi*, 427 S.W.3d 400, 404 (Tex. App.—Corpus Christi–Edinburg 2013, pet. denied) ("Proceeds of bonds voted by the

people must be used for the purposes for which they were voted." (citing *Lewis v. City of Fort Worth*, 89 S.W.2d 975, 978 (Tex. 1936)); *Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 269 S.W.3d 628, 633–34 (Tex. App.—San Antonio 2008, pet. granted, judgm't vacated w.r.m.) (recognizing the propriety of the doctrine); *Taxpayers for Sensible Priorities v. City of Dallas*, 79 S.W.3d 670, 676 (Tex. App.—Dallas 2002, pet. denied) ("It is elementary that the proceeds of bonds voted by the people must be expended for the purposes for which they were voted."). Invoking the doctrine fits within the taxpayer standing exception because it constitutes an allegation that the government intends to unlawfully expend public funds. *See City of San Antonio v. Headwaters Coal., Inc.*, 381 S.W.3d 543, 550 (Tex. App.—San Antonio 2012, pet. denied) ("Whether characterized as a 'contract with voters' suit or, as argued by the City, a 'taxpayer suit,' there is no dispute that proceeds of bonds voted by the people must be expended for the purposes for which they were voted.").

## B.    No Taxpayer Standing

The Taxpayers allege that South Texas ISD is unlawfully levying and expending public funds because Willacy County voters only agreed to be taxed for the limited purpose of maintaining and operating a rehabilitation district for persons with disabilities, not an independent school district that primarily serves persons without disabilities. We agree with the Taxpayers that the plain language of the 1974 order calling for a special election dedicated the use of the ad valorem tax "for the training and guidance of Handicapped Trainees." We also agree with the Taxpayers that when the Legislature expanded the purpose of rehabilitation districts in 1983, South Texas ISD should have

13

sought voter approval if it wanted to continue levying an ad valorem tax for any new purpose. *See San Saba County*, 108 S.W.2d at 203; *see also* TEX. CONST. art. VII, § 3(e) (authorizing the Legislature "to pass laws for the assessment and collection of taxes in all school districts . . . provided that a majority of the qualified voters of the district voting at an election to be held for that purpose, shall approve the tax"). And if this suit had been brought at or near the time that South Texas ISD changed its purpose in 1983, we would have no problem finding taxpayer standing. But because this action was brought forty years after the fact, we conclude that "[t]he potential for disruption of government operations is too great" to extend taxpayer standing in this case. *See Blue*, 34 S.W.3d at 558.

In *Blue*, the plaintiffs alleged that the local school district unlawfully entered a financing agreement for the construction of a new high school and sought to enjoin the district from using public funds to make future payments under the contract. *Id.* at 549. Accepting this allegation of illegality as true, the Supreme Court of Texas nevertheless declined to extend taxpayer standing to the plaintiffs. *Id.* at 557. By the time the plaintiffs brought their suit, the new high school had already been built, students had attended the new school for nearly a year, and all that was left under the financing agreement was for the school district to make its scheduled payments. *Id.* at 556. Under those facts, and considering the equitable relief sought by the plaintiffs, the court concluded that the "balance in costs and benefits shift[ed] significantly" towards denying taxpayer standing. *Id.* at 558.

Here, at the time of appellees' suit, South Texas ISD had been operating as an

14

independent school district for forty years. In that time, it has made countless maintenance and operational decisions with the expectation that it would collect annual ad valorem taxes to partially fund its short- and long-term obligations. The evidence establishes that South Texas ISD collects over $34 million in local tax revenue annually from the property owners in the three counties that it serves. In 2022, local revenue accounted for more than 38% of the district's total revenue.

The Taxpayers suggest that if their suit is successful, the financial hardship to South Texas ISD would be minimal because the shared taxbase between South Texas ISD and Lyford CISD only represents $750,000 of the local revenue South Texas ISD collects annually. The problem with the Taxpayer's contention is that their suit applies to every property owner in Willacy County, not just those within Lyford CISD. Indeed, their suit seeks a declaratory judgment "finding that the Board of Trustees of South Texas ISD lacks the authority to assess a tax on the taxpayers of Willacy County." As previously noted, Willacy County is also served by three other independent school districts, which means that Lyford CISD's tax base represents only a fraction of South Texas ISD's overall tax base within Willacy County.

The record does not reflect what portion of South Texas ISD's local revenue is derived solely from Willacy County taxpayers. In other words, we do not know whether each of the three counties contributes roughly the same amount to South Texas ISD's local revenue or, for example, if Willacy County contributes some lesser amount. But even if we assume that Hidalgo and Cameron Counties contribute the lion's share of the $34 million in local revenue, the real financial impact of the Taxpayer's suit far exceeds

$750,000 annually. And like the school district in *Blue*, eliminating even a few million dollars from South Texas ISD's annual revenue would significantly impair the district's ability to meet its ongoing and rising financial obligations.[7] *See id.*

The Taxpayers also suggest that the State would simply step in and fill any gap in funding if South Texas ISD could no longer collect ad valorem taxes from Willacy County property owners. The idea that the State would "fully fund" a local school district that receives no financial support from part of the local community it serves is inconsistent with how public schools are financed in Texas. There is an expectation baked into the finance system that every independent school district will be partially funded by local tax revenue, or what is referred to as the "local share." *See* TEX. EDUC. CODE ANN. § 48.001(b) ("The public school finance system of this state shall adhere to a standard of neutrality that provides for substantially equal access to similar revenue per student at similar tax effort, considering all state and local tax revenues of districts after acknowledging all legitimate student and district cost differences."); *Morath v. Tex. Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 836 (Tex. 2016) (explaining that "the basic structure for funding the public schools" includes "[l]ocal, state, and federal funds"). Although South Texas ISD's M & O tax rate may be modest compared to other independent school districts in the state, the taxpayers served by the tri-county district are still expected to contribute their share of funding. But even if the Taxpayers are correct and the Legislature

---

[7] South Texas ISD argues, as it did in the trial court, that an adverse decision on the merits in this case would imperil the entirety of its local revenue because it also failed to get approval for its change in purpose from Hidalgo and Cameron County voters. According to South Texas ISD, this suit is essentially a bellwether case. Although we are focused on the case before us, we note that if South Texas ISD's assumption about future taxpayer suits in Hidalgo and Cameron Counties is correct, such a result would be catastrophic to its operations. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 558 (Tex. 2000).

16

is not only able but willing to make such an expenditure, shifting millions of dollars in additional state revenue to a local school district every year is a zero-sum game that still represents a significant disruption in government operations. *See Blue*, 34 S.W.3d at 558.

In declining to extend taxpayer standing in *Blue*, the court also cited the threat the plaintiffs' suit posed to "the settled expectations of other taxpayers in the district who are also served by the high school." 34 S.W.3d at 558. Those countervailing expectations were formed over a handful of years. *See id.* at 549. By comparison, the expectations of the other taxpayers who are also served by South Texas ISD took root several decades ago and have become firmly fixed over multiple generations.[8]  Indeed, having paid the tax and accepted the benefits of South Texas ISD for forty years without complaint, it is arguable that the voters of Willacy County have effectively ratified South Texas ISD's change in purpose. *See BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 200 (Tex. 2021) ("Acceptance of benefits is a quintessential indicator of ratification, and it will support a finding of ratification as a matter of law in many cases.").

As a limited exception to the general rule, taxpayer standing is subject to certain equitable considerations. *Blue*, 34 S.W.3d at 558. Taxpayer standing is foreclosed when the taxpayer's suit would cause a significant disruption to government operations and disturb the settled expectations of other taxpayers. *Id.* For the reasons explained above, we conclude that those equitable considerations are paramount in this case. Accordingly,

---

[8] For instance, a group of ten South Texas ISD parents attempted to intervene in the suit in favor of South Texas ISD's taxing authority. These fellow taxpayers, who reside across the tri-county district, sought a declaration that South Texas ISD's property tax is legal. Appellees filed a motion to strike their plea in intervention, which was granted by the trial court.

we conclude the Taxpayers lacked standing to sue, and consequently, the trial court lacked subject matter jurisdiction over their action.

## B. Lyford CISD Lacks Standing

Lyford CISD does not claim taxpayer standing. Instead, it argues on appeal that it can satisfy the three elements of standing because it "is directly harmed by the collection of South Texas ISD's property tax." If South Texas ISD were enjoined from levying a property tax in Willacy County, Lyford CISD claims that "it could either increase its [I & S] fund tax rate and reduce the District's bond indebtedness; or, in the alternative, it could access an additional $.05 [M & O] tax without any burden on its taxpayers." South Texas ISD contends that Lyford CISD cannot meet any of the elements of standing: injury in fact, traceability, or redressability. *See Heckman*, 369 S.W.3d at 154–55.

In discussing the constitutional limitations on standing, the Supreme Court of the United States explained that "judicial power exists only to redress or otherwise protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Consequently, courts may only exercise jurisdiction "when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'" *Id.* (quoting *Linda R.S. v. Dirchard D.*, 410 U.S. 614, 617 (1973)). Here, there is no question that the Taxpayers have asserted a concrete harm, even if it is a generalized grievance. On the other hand, Lyford CISD's relationship to that harm is tenuous at best.

It is undisputed that Lyford CISD does not pay property taxes to South Texas ISD and has therefore failed to allege any kind of concrete harm in that regard. Rather,

according to Lyford CISD's petition, its claims hinge on "the imposition of an unlawful tax on its taxpayers." However, "the plaintiff generally must assert his own legal rights and interests . . . and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 499 (collecting cases). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

Here, Lyford CISD alleges that South Texas ISD's property tax impairs Lyford CISD's ability to raise its own taxes. But as Dr. DeWitt acknowledged, South Texas ISD's tax rate has no legal impact on Lyford CISD's ability to set its own tax rate. Lyford CISD is already levying the highest possible M & O tax rate allowed under the law without seeking voter approval. She also acknowledged that it is purely within Lyford CISD's discretion whether to call an election to increase this rate. In fact, Willacy County voters just approved a tax increase in 2022 when they voted in favor of Lyford CISD's $24 million bond proposal. Nevertheless, Dr. DeWitt suggested that, if South Texas ISD no longer levied a tax on their shared taxbase, those taxpayers would be more inclined to vote in favor of additional taxes for Lyford CISD in some future hypothetical election. Not only is this outcome in a hypothetical election purely speculative, but we fail to see how this alleged injury is "imminent" or "particular" to Lyford CISD. *See id.* at 560–61. Under Lyford CISD's theory of harm, all the other local school districts that overlap with South Texas ISD in Hidalgo, Cameron, and Willacy Counties could make the same claim. *See id.* at 560 n.1 (explaining that a "particularized injury" is one that "affect[s] the plaintiff in a

19

personal and individual way"). For that matter, any governmental entity in those counties that needs voter approval to impose or increase a tax could make a similar claim. At most, Lyford CISD hopes for a collateral benefit by attempting to vindicate the rights of third parties who themselves do not have standing to bring their own claims. *See Warth*, 422 U.S. at 499. Consequently, we conclude that Lyford CISD "has not made the requisite demonstration of (at least) injury and redressability." *See Lujan*, 504 U.S. at 563.

In sum, without reaching South Texas ISD's other issues, we conclude that appellees lacked standing to bring their claims. Therefore, the trial court erred when it denied South Texas ISD's plea to the jurisdiction. South Texas ISD's first issue is sustained.

## IV. CONCLUSION

We reverse and render a judgment of dismissal for want of jurisdiction.

GINA M. BENAVIDES
Justice

Delivered and filed on the
1st day of August, 2024.